IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 6:16-CR-48 |
| | § | Judge Clark/Mitchell |
| GERARD CARL DENGLER (01) | § | |
| SUZANNE DENGLER (02) | § | |

## **INFORMATION**

THE UNITED STATES ATTORNEY CHARGES:

### **General Allegations**

At all times relevant to this Information:

Medicare Program

1.      The Medicare Program (Medicare) is a federal health care program

providing benefits to persons who are over the age of 65 years old and some persons

under the age of 65 who are blind or disabled.  Medicare is administered by the Centers

for Medicare and Medicaid Services, a federal agency under the United States

Department of Health and Human Services.  Individuals who receive benefits under

Medicare are referred to as Medicare "beneficiaries."

2.      Medicare is a "health care benefit program," as defined by 18 U.S.C. §

24(b), in that it is a public plan affecting commerce under which medical benefits, items,

and services are provided to individuals and under which individuals and entities who

provide medical benefits, items, or services may obtain payments.

3.      Medicare is a "Federal health care program," as defined by 42 U.S.C. §

1320a-7b(f), in that it is a plan or program that provides health benefits, whether directly,

Information – Page 1

through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government.

4.     The Medicare program includes a hospital insurance benefit known as Part A.  Under Part A, coverage is provided, subject to certain conditions and limitations, for inpatient hospital services, skilled nursing facility (SNF) services, home health services, and hospice care.

5.     Part A uses a "Prospective Payment System" (PPS) to pay for covered services.  With PPS, the provider is paid a fixed, per-diem amount for each Part A patient.  This flat rate covers the routine, ancillary, and capital-related costs associated with the patient's stay at the facility.

6.     The Medicare program also includes a voluntary supplemental insurance benefit known as Part B.  Coverage is provided under Part B for medical and surgical services provided by physicians as well as other health benefits, including ambulance transportation, durable medical equipment, and outpatient hospital services (*e.g.,* CT scans, MRIs, X-rays, etc.).

7.     Unlike Part A, Part B is a fee-for-service system.  A Medicare Fee Schedule establishes the maximum allowable fee for the specific service provided.  With this system, the provider submits a claim to Medicare for each specific service provided.

Medicare and Clinical Laboratory Services

8.     Medicare Part B covers medically necessary clinical diagnostic laboratory services that are ordered by physicians or practitioners.  Laboratory testing includes certain blood tests, urinalysis, tests on tissue specimens, and some preventative screening

tests (*e.g.*, cardiovascular and diabetes screening blood tests).  The tests must be provided by a laboratory that meets Medicare requirements.

9.      Medicare allows separate charges made by laboratories for drawing or collecting specimens regardless of whether the specimens are referred to hospitals or independent laboratories.  Medicare allows a specimen collection fee when it is medically necessary for a laboratory technician to draw a specimen from either a SNF patient or a homebound patient.  The technician must personally draw the specimen (*i.e.*, venipuncture or urine sample by catheterization).

10.     In addition to a specimen collection fee, Part B covers a travel allowance for a laboratory technician to draw a specimen from either a SNF patient or a homebound patient.  This travel allowance is intended to cover the estimated travel costs of collecting a specimen and to reflect the technician's salary and travel costs.

11.     The additional allowance can be made only where a specimen collection fee is also payable.  No travel allowance is made where the technician merely performs a messenger service to pick up a specimen drawn by a physician or SNF personnel.

12.     The travel allowance for each claim is calculated pursuant to certain rules depending on which Healthcare Common Procedure Coding System (HCPCS) code is used.  The HCPCS codes for travel allowances are P9603 for a Per-Mile Travel Allowance and P9604 for a Flat Rate.

13.     The per-mile travel allowance (P9603) is to be used in situations where the average trip to SNFs or patients' homes is longer than 20 miles round trip.  At no time is the laboratory allowed to bill for more miles than are reasonable or for miles not actually

traveled by the laboratory technician.  The per-mile allowance is computed using the federal mileage rate plus an additional amount set by CMS to cover the technicians' time and travel costs.  For 2014, the minimum travel allowance was $1.01 per mile.

14.     The flat-rate travel allowance (P9604) is to be used in areas where average trips are less than 20 miles round trip.  For 2014, the flat rate was $10.10 per trip.

15.     Regardless of which travel allowance is used, the mileage claimed is to be pro-rated by the number of patients, both Medicare and non-Medicare, from whom specimens were drawn on a given trip.

Elite Lab Services, LLC and the Defendants

16.     In or about July 2005, Elite Lab Services, LLC (Elite) was formed as a Texas limited liability corporation.

17.     In or about August 2005, Elite began operating as a multi-service, clinical diagnostic laboratory testing facility.  The company served nursing home clients located within the Eastern District of Texas and elsewhere.

18.     Elite was headquartered in Tyler, Texas.  The company also had branch offices in Waco, Texas, and Texarkana, Texas.

19.     **Gerard Carl Dengler** served as Elite's President and CEO.  He held 100% stock ownership of the company.

20.     **Suzanne Dengler** was Elite's Chief Operating Officer.

21.     The company employed approximately 90 people, including more than 50 phlebotomists.

22.     Elite's phlebotomists traveled to client nursing homes for the collection of patient blood samples.  The typical method of collection was by way of venipuncture.  The samples were then transported back to Elite's lab in Tyler, Texas, for testing.

23.     Elite was a Medicare provider.  The nursing homes serviced by Elite included patients covered by Medicare Part A as well as patients covered by Part B.

24.     When Elite provided sample collection and laboratory services to Part A patients, the nursing homes were billed for payment.  Elite billed Medicare when such services were provided to patients covered by Part B.  Elite used a per-mile travel allowance to bill Medicare.

25.     In or about 2009, Elite began using a laboratory information management system known as CyberLab.  This software interfaced with the analytical instrumentation of Elite's laboratory as well as the company's billing software.

26.     After all of the blood sample requisitions for a given day were entered, CyberLab totaled the number of venipunctures and the route mileage for the sample collections.  CyberLab then calculated the mileage per sample.

27.     To determine the mileage reimbursement billed to Medicare, the mileage-per-sample figure was multiplied by the number of draws from Part B beneficiaries.  That total was then multiplied by the applicable Medicare travel allowance rate.  Elite would use the resulting reimbursement figure to bill Medicare on every claim made for that particular date of service.

28.     Data regarding collection routes and mileage was manually programmed into CyberLab.  Administrative-level access was required to input mileage values.

**Gerard Carl Dengler** and **Suzanne Dengler** were among the few Elite employees with

such access.

29.    The collection and mileage information was transferred from CyberLab to

Elite's billing software and then submitted to Medicare for payment.

## COUNT 1

<u>Violation</u>:  18 U.S.C. § 1349
(Conspiracy to Commit
Health Care Fraud)

1.    The General Allegations section of this Information is re-alleged and

incorporated by reference as though fully set forth herein.

2.    From in or around April 2014, and continuing through October 22, 2014, in

the Eastern District of Texas, the defendants, **Gerard Carl Dengler** and **Suzanne**

**Dengler**, did knowingly and willfully combine, conspire, confederate, and agree with

each other to violate 18 U.S.C. § 1347, that is, to execute a scheme and artifice to defraud

a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that

is, Medicare, and to obtain, by means of materially false and fraudulent pretenses,

representations, and promises, money and property owned by, and under the custody and

control of Medicare, in connection with the delivery of and payment for health care

benefits, items, and services.

### Purpose of the Conspiracy

3.      It was the general purpose of the conspiracy for the defendants **Gerard Carl Dengler** and **Suzanne Dengler** to unlawfully obtain money from Medicare through misrepresentations and violations of Medicare and rules.  To this end, the defendants would, among other things, (a) submit or cause the submission of false and fraudulent claims to Medicare, and (b) conceal the submission of false and fraudulent claims to Medicare.

### Manner and Means of the Conspiracy

The manner and means by which the defendants sought to accomplish the object and purpose of the conspiracy included, among others, the following:

4.      To achieve the goals of the conspiracy, the defendants devised and carried out a scheme to defraud Medicare through the submission of false and fraudulent claims. The defendants caused route mileage to be fraudulently inflated.  This route mileage was used to bill Medicare for travel allowance reimbursements.  The defendants then submitted false and fraudulent claims that included the inflated mileage.  Such fraudulent claims resulted in improper reimbursement from Medicare.  By means of these fraudulent billing practices, the defendants unlawfully obtained more than $160,000 from Medicare.

5.      **Gerard Carl Dengler** and **Suzanne Dengler**, with the assistance of others, controlled the operations of Elite.

6.      **Gerard Carl Dengler** was designated as the authorized official and representative of Elite on documents provided to Medicare.

7.     **Gerard Carl Dengler** maintained a valid Medicare provider number on behalf of Elite.

8.     **Gerard Carl Dengler** and **Suzanne Dengler** maintained bank accounts for the purpose of receiving and disbursing Medicare payments.

9.     Beginning no later than April 21, 2014, **Gerard Carl Dengler** and **Suzanne Dengler** made or caused to be made fraudulent changes to the CyberLab route mileage used to calculate daily travel allowance billed to Medicare.

10.     Elite performed venipunctures and related laboratory analyses at nursing homes that were included on the CyberLab routes for which **Gerard Carl Dengler** and **Suzanne Dengler** had made or caused to be made fraudulent mileage changes.

11.     Elite sought reimbursement for mileage that included the fraudulent amounts that **Gerard Carl Dengler** and **Suzanne Dengler** added or caused to be added to CyberLab routes.

12.     **Gerard Carl Dengler** and **Suzanne Dengler** caused false and fraudulent claims to be submitted to Medicare using Elite's Medicare provider number.

13.     Based on these false and fraudulent claims, reimbursement of more than $160,000 was paid by Medicare to an account controlled by **Gerard Carl Dengler** and **Suzanne Dengler**.

14.     **Gerard Carl Dengler** and **Suzanne Dengler** obtained control of the funds paid by Medicare to Elite and used portions of these monies for their personal benefit.

All in violation of 18 U.S.C. § 1349.

BRIT FEATHERSTON
ACTING UNITED
STATES ATTORNEY

_____
L. Frank Coan, Jr.
Assistant United States Attorney
Bar No. 170966 (Georgia)
110 N. College, Suite 700
Tyler, Texas 75702
(903) 590-1400
(903) 590-1439 Fax
frank.coan@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | No. 6:15-CR-48 |
| | § | Judge Clark/Mitchell |
| GERARD CARL DENGLER (01) | § | |
| SUZANNE DENGLER (02) | § | |

## NOTICE OF PENALTY

VIOLATION:                    18 U.S.C. § 1349

Imprisonment for a term of not more than ten
(10) years; a fine not to exceed $250,000, or
twice any pecuniary gain to the defendants or
loss to the victim; or both, imprisonment and a
fine; and a term of supervised release of not
more than three (3) years.

SPECIAL ASSESSMENT:          $100.00